# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Tracy Alan Zornes, | Case No. 16-cv-1730-ECT-KMM |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Michelle Smith, | |
| Respondent. | |

Robert H. Meyers, Office of the Federal Defender, for petitioner Tracy Alan Zornes.[1]

Cecilia A. Knapp, Clay County Attorney's Office, for respondent Michelle Smith.

*** 

Petitioner "Tracy Alan Zornes was convicted of the first-degree premeditated murders of Megan Londo and John Cadotte, arson for setting a fire that destroyed the apartment building where Londo and Cadotte were murdered, and theft of Cadotte's car." *State v. Zornes* ("*Zornes I*"), 831 N.W.2d 609, 612 (Minn. 2013). The trial court sentenced Mr. Zornes to consecutive life sentences without possibility of parole on the murder convictions. *Id.* at 617. Mr. Zornes appealed those convictions directly to

---

[1] This Court appointed Mr. Meyers to represent Mr. Zornes with respect to the claim raised in Ground One of the petition for a writ of habeas corpus. *See* ECF No. 45. The remaining claims were litigated by Mr. Zornes pro se.

the Minnesota Supreme Court, which affirmed. *Id.* at 628. Twice Mr. Zornes sought post-conviction relief in the state courts; the state courts denied both requests. *See Zornes v. State* ("*Zornes II*"), 880 N.W.2d 363 (Minn. 2016); *Zornes v. State* ("*Zornes III*"), 903 N.W.2d 411 (Minn. 2017).

Now before the Court is Mr. Zornes's petition for a writ of habeas corpus. *See* Petition [ECF No. 1]; 28 U.S.C. § 2254. Mr. Zornes challenges the validity of his convictions on thirteen grounds. After review, this Court concludes that several of the claims raised by Mr. Zornes in this habeas corpus proceeding are procedurally barred, because those claims were not "fairly presented" to the state courts. The remaining claims fail on the merits. Accordingly, it is recommended that Mr. Zornes's habeas petition be denied.

## I. BACKGROUND

"Following an early-morning apartment fire in Moorhead in February 2010, the bodies of Megan Londo and John Cadotte were discovered by emergency personnel. Londo and Cadotte had both been beaten and stabbed, and had died before the apartment was set ablaze." *Zornes II*, 880 N.W.2d at 367. A smoke detector had been removed from the incinerated room. *See Zornes I*, 831 N.W.2d at 614. A couple of days later, "a passerby found the burnt remains of Cadotte's Honda Civic. The police were called, and during the subsequent processing of the car, investigators recovered the remains of a smoke detector." *Id.* at 615.

Police quickly narrowed in on Mr. Zornes as a person of interest in the crimes. Among other factors, Mr. Zornes's nephew, "S.W.," told police that he had watched Mr. Zornes torch a red Honda Civic matching the description of Mr. Cadotte's vehicle. *Id.* Mr. Zornes had gone on the lam by this point, hiding out at a makeshift campsite in the woods. *Id.* at 616. Police located Mr. Zornes after they convinced "one of Zornes's friends, who had been helping Zornes while he was hiding from the police, to reveal Zornes's location to them." *Id.* During a pat down search of Zornes, the police recovered a folding knife. They also seized a hammer, screwdriver, utility knife, and scissors from Zornes's campsite.

Mr. Zornes was indicted on two counts of first-degree premeditated murder, two counts of second-degree intentional murder, first-degree arson of a dwelling, and theft of a motor vehicle. *See Zornes I*, 831 N.W.2d at 616. The jury voted to convict on all counts except the charges of second-degree murder, and the court sentenced Mr. Zornes "to two consecutive life sentences without the possibility of parole for the two first-degree premeditated murder convictions, a consecutive 48-month sentence for the arson conviction, and a 30-month sentence for the motor-vehicle theft conviction to run consecutive with the other sentences." *Id.* at 617 (footnote omitted).

Three times the matter has appeared before the Minnesota Supreme Court on appellate review: the direct appeal from the conviction, the appeal from the denial of

his first petition for post-conviction review, and the appeal from the denial of his second petition for post-conviction review.[2]

On direct review, Mr. Zornes raised four claims before the Minnesota Supreme Court. First, Mr. Zornes contended that his right to a public trial, as guaranteed by the Sixth Amendment of the federal constitution, was violated when two persons—his girlfriend, who is identified by the Minnesota Supreme Court as "E.M."; and the brother of victim John Cadotte—were removed from the courtroom during voir dire. *See Zornes I*, 831 N.W.2d at 618-21. Second, Mr. Zornes argued that the trial court improperly admitted an ambiguous statement—either "this wasn't anything sexual" or "it wasn't sexual related"—that he made to police immediately before or during what was later found by the trial court to be an unlawful warrantless search following his arrest. *Id.* at 621-24. Third, Mr. Zornes argued that the trial court abused its discretion by admitting into evidence the folding knife, utility knife, scissors, screwdriver, and hammer found either on his person or at his campsite at the time of his arrest; Mr. Zornes had contended that nothing directly tied those items to the crime scene, they were irrelevant to the case, and were therefore inadmissible under state law. *Id.* at 624-26. Fourth, Mr. Zornes argued that the trial court abused its discretion in deciding that, if Mr. Zornes elected to testify, evidence about his three

---

[2] Under Minnesota law, "[a] defendant may appeal as of right from the district court to the Supreme Court from a final judgment of conviction of first-degree murder." Minn. R. Crim. P. 29.02, subd. 1(a). This right of immediate appeal to the Minnesota Supreme Court persists through post-conviction review.

4

prior felony convictions could be used to impeach his testimony.  *Id.* at 626-28.  The Minnesota Supreme Court rejected each of the four claims on the merits.

Mr. Zornes next filed a petition for post-conviction review in state court.  *See* Minn. Stat. § 590.01.  The Minnesota Supreme Court, on review of the denial of the petition by the trial court, characterized the petition as raising three categories of claims.  First, according to the Minnesota Supreme Court, Mr. Zornes raised several new claims of "trial errors," including

> that the prosecution: (1) improperly argued that he had the "means" to commit the murders although his pocketknife was incapable of inflicting some of the victims' wounds; (2) submitted a "false and misleading" witness list to the court; (3) entered photos and testimony into evidence without foundation; and (4) committed misconduct in its questioning of a witness.  Zornes also argue[d] that the prosecutor committed misconduct during closing argument by (5) improperly referring to his choice not to testify; (6) making other prejudicial statements; and (7) using an "inflammatory" computer-based slide presentation.

*Zornes II*, 880 N.W.2d at 368.  The trial court found, and the Minnesota Supreme Court agreed, that each of these claims of "trial error" were or should have been known to Mr. Zornes at the time of the direct appeal and therefore could not be raised in a post-conviction proceeding, invoking what is known in Minnesota as the *Knaffla* rule.  *Id.* at 368-69 (citing *State v. Knaffla*, 243 N.W.2d 737, 741 (Minn. 1976)); Minn. Stat. § 590.01, subd. 1.

Second, Mr. Zornes raised several claims of ineffective assistance of trial counsel in his initial petition for post-conviction review.  Most of these claims

correlated to the seven arguments of "trial error" listed above; for example, Mr. Zornes claimed that the prosecutor committed misconduct by using inflammatory tactics during her closing arguments, and then claimed that his trial counsel was ineffective for failing to object to the use of those tactics and seek a mistrial. Both the district court reviewing Mr. Zornes's habeas petition and the Minnesota Supreme Court concluded that, just as Mr. Zornes could have raised the claims of trial error on direct appeal, so too could he have raised the claims of in-court ineffective-assistance-of-trial-counsel claims on direct appeal, and thus these claims were also barred by *Knaffla*. *Zornes II*, 880 N.W.2d at 369.

But Mr. Zornes also raised a claim of ineffective assistance of trial counsel *not* based on the trial errors listed above: in light of evidence, not presented at trial, showing that the tools procured from the search of his campsite could not have inflicted many of the victims' wounds, his trial counsel was ineffective in failing to prevent the tools from being admitted into evidence. *Id.* at 369-70. The district court found that this claim was also barred by *Knaffla*, but the Minnesota Supreme Court hedged its bets, concluding that "even if this issue is not *Knaffla*-barred," the claim failed on the merits. *Id.* at 370.

Third, Mr. Zornes argued that his *appellate* counsel provided ineffective assistance in three respects: (1) by failing to raise on direct appeal the ineffective-assistance-of-trial-counsel claim, regarding his trial counsel's failure to prevent the tools from being introduced into evidence; (2) by failing to raise any claim regarding

6

the prosecution's use of a PowerPoint slide during closing arguments that, he contended, "contain[ed] information not admitted into evidence," and (3) by failing to raise any claim that the prosecutor had committed misconduct during her closing argument when she referred to Mr. Zornes's decision not to testify at trial. *Zornes II*, 880 N.W.2d at 371, 373. All three ineffective-assistance-of-appellate-counsel claims were rejected on the merits by the Minnesota Supreme Court.

Mr. Zornes filed the instant federal habeas corpus petition while the appeal of his first petition for post-conviction review remained pending before the Minnesota Supreme Court. Mr. Zornes expressly conceded in the habeas petition that three of the grounds raised in his petition— Grounds Eleven, Twelve, and Thirteen—had not yet been raised either on direct appeal or in his first petition for post-conviction review. *See* Petition at 12, 22-24. The government, therefore sought dismissal of the habeas petition on the grounds that Mr. Zornes had raised both exhausted and unexhausted claims, *see Rose v. Lundy*, 455 U.S. 509, 522 (1982), or, alternatively, asked for denial of Grounds Eleven through Thirteen as procedurally barred, *see* 28 U.S.C. § 2254(b). In response, Mr. Zornes requested that this matter be held in abeyance while he returned to state court and presented the issues in a second petition for post-conviction review. This Court concluded that Ground Thirteen, which depended in part upon a recent forensic analysis not available to Mr. Zornes at the time he filed his first petition for post-conviction review, might plausibly be considered on the merits in the state courts. *See* ECF No. 27 at 6. Accordingly, this Court recommended that

7

this matter be stayed pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), while Mr.

Zornes returned to state court and litigated his second petition for post-conviction

review. *Id.* at 26-27. The recommendation of a stay was adopted without objection

from the parties. *See* ECF No. 28.

Mr. Zornes filed his second petition for post-conviction review in state court

raising not only the three claims he had identified in his federal habeas petition as not

previously having been raised (Grounds Eleven through Thirteen), but others as well,

including:

> 1. The prosecution failed to provide him with a number of documents that he only recently has discovered, which he believes is a *Brady*[3] violation;

> 2. The forensic pathologist's report provided newly discovered evidence of actual innocence;

> 3. His investigator discovered new evidence of recantations of trial witnesses;

> 4. Trial counsel provided ineffective assistance by failing to strike jurors who were biased;

> 5. Trial counsel provided ineffective assistance by failing to conduct an investigation; and

> 6. Law enforcement officials did not sufficiently investigate his case.

*Zornes III*, 903 N.W.2d at 416. The Minnesota Supreme Court concluded that the first

three of the claims lacked merit—the evidence cited by Mr. Zornes in support of his

---

[3] *See Brady v. Maryland*, 373 U.S. 83 (1963).

*Brady* claim was not material; the forensic pathologist's report would have been

unlikely to produce an acquittal or more favorable result if introduced at trial; and the

witness-recantation claim was unsupported by evidence—while the remaining three

claims were or could have been known at the time of the direct appeal and were

therefore barred under *Knaffla*. *Id.* at 416-21.

The parties submitted additional briefing following the conclusion of Mr.

Zornes's second state post-conviction proceeding. After that briefing was submitted,

this Court appointed counsel to prepare a memorandum of law on the following

question:

> The Minnesota Supreme Court concluded that Mr.
> Zornes's right to a public trial had not been violated during
> his criminal proceedings. Was this conclusion contrary to
> or did it involve an unreasonable application of clearly
> established federal law, as claimed in Ground One of Mr.
> Zornes's habeas petition?

ECF No. 45 at 1. Supplemental briefing on that issue has now been submitted by

both parties, and Mr. Zornes's habeas corpus petition is ripe for review.

## II. ANALYSIS

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets

forth the standards that govern this Court's substantive review of Mr. Zornes's habeas

corpus claims. The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides that:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court

shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court discussed § 2254(d)(1) and how it should be applied by federal district courts. The Supreme Court recognized that

> a state-court decision can be "contrary to" this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Id.* at 405.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The Supreme Court also explained that

> [a] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . . [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 411.

A writ of habeas corpus is also available where the state court's resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In other words, habeas relief can be granted if the conviction is based on findings of fact that could not reasonably be derived from the state court evidentiary record. When reviewing a state court decision, however, "a federal court . . . presumes that the state court's factual determinations are correct; this presumption may be rebutted only by clear and convincing evidence." *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir .2000). In addition, 28 U.S.C. § 2254(e)(1) provides that

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

"AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v.*

*Lett*, 559 U.S. 766, 773 (2010) (citations and quotations omitted). Habeas relief cannot be granted unless the petitioner has identified and substantiated a specific error committed by the state courts. Moreover, the petitioner must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court. Finally, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## B. *Procedural Default*

Generally, "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotations omitted). Each claim for relief raised in a federal habeas petition must independently be exhausted in the state courts. Presentation of a mixed petition—that is, a habeas petition raising both exhausted and unexhausted claims—is grounds for dismissal of the *entire* habeas petition without prejudice. *See Lundy*, 455 U.S. at 522.

Section 2254(b), however, requires that the habeas applicant exhaust only those state-court remedies that are "available." 28 U.S.C. § 2254(b)(1)(A). Where state procedural rules prevent examination of the merits of a claim, the petitioner

technically has satisfied the exhaustion requirement of § 2254(b), because no state-court remedies remain "available" for that claim. *See McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997). Still, though, because the applicant can no longer fairly present the claim to the state courts in a manner that entitles the applicant to a ruling on the merits, the applicant is usually barred from seeking federal habeas corpus relief on that claim. *See Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). This kind of claim—one that has not been fairly presented to the state courts and is now barred from consideration by state-law procedural rules—is said to have been procedurally defaulted. *See McCall*, 114 F.3d at 757. A procedurally defaulted claim must be denied—assuming that the respondent has interjected the affirmative defense of procedural default—unless the petitioner "can demonstrate either cause and actual prejudice, or that a miscarriage of justice will occur if we do not review the merits of the petition." *Id.*

## C. Overview of Mr. Zornes's Claims

Mr. Zornes, as a formal matter, raises thirteen grounds for relief in his habeas corpus petition. This list somewhat oversimplifies things, though. Many of the grounds for relief in the habeas petition are presented as "direct" claims of error—mostly, claims that Mr. Zornes's convictions must be overturned as a result of prosecutorial misconduct. But Mr. Zornes also requested partway through this habeas corpus proceeding that his petition be interpreted as raising ancillary claims of ineffective assistance of trial counsel (for failure to object at trial or raise certain

arguments regarding the alleged prosecutorial misconduct) and ineffective assistance of appellate counsel (for failure to raise the claims of prosecutorial misconduct on direct appeal).  *See* ECF No. 35 at 4.  Thus, for example, Ground Seven of the habeas petition expressly raises a claim that the prosecution suborned perjury from a witness, *see* Petition at 18, but Mr. Zornes also asks, that Ground Seven be interpreted as raising a claim of ineffective assistance of trial counsel (because no objection was made to the allegedly suborned perjury) and ineffective assistance of appellate counsel (because no claim regarding suborned perjury was raised on appeal).  *Id.*

As explained above, however, only if a specific claim has been fairly presented to the state courts may that claim be considered on the merits in this habeas corpus proceeding; it is not enough for a related claim based on the same facts to have been raised.  *See, e.g.*, *Wyldes v. Hundley*, 69 F.3d 247, 253 (8th Cir. 1995) (citing *Tippitt v. Lockhart*, 903 F.2d 552, 554 (8th Cir. 1990)).  For example, to the extent that Mr. Zornes seeks habeas relief on claims of prosecutorial misconduct, he must establish that he has fairly presented those specific claims to the Minnesota Supreme Court. Similarly, to the extent that Mr. Zornes seeks relief for ineffective-assistance related to an instance of alleged prosecutorial misconduct, he must establish that he has fairly presented *that* ineffective-assistance claim to the Minnesota Supreme Court.  Thus, any given ground for relief raised by Mr. Zornes may contain multiple disparate claims, and those claims have been fairly presented to the Minnesota Supreme Court in whole, in part, or not at all.

14

With that in mind, the grounds for relief raised in Mr. Zornes's habeas petition can be grouped into three categories.  First, some of the grounds—specifically, Grounds Three, Four, Five, Six, Seven, and Twelve—have not been fairly presented to the Minnesota Supreme Court at all, whether interpreted as direct claims of error, claims of ineffective assistance of trial counsel, or claims of ineffective assistance of appellate counsel.  Those grounds are procedurally barred and, as this Court will explain below, should be denied on that basis.  Second, some of the grounds— specifically, Grounds Eight, Nine, Ten, and Eleven—are procedurally barred in part, but certain of the claims either raised or implied by those grounds were fairly presented to the Minnesota Supreme Court.  With respect to those grounds for relief, this Court will examine the extent to which the grounds have been procedurally defaulted and then continue to the merits of any claims that have been fairly presented.  Third, the remaining grounds raised by Mr. Zornes—specifically, Grounds One, Two, and Thirteen—were fairly presented to the Minnesota Supreme Court in a manner that plainly entitled Mr. Zornes to review before that court.  Those grounds for relief are not procedurally defaulted, and this Court will proceed to the merits of the claims raised within those grounds.

## D. Procedurally Defaulted Grounds

### 1. Grounds Three and Six

Two spectators were removed from the courtroom during voir dire at Mr. Zornes's trial, and many other persons were potentially excluded from the courtroom

15

for the entirety of the trial proceedings because the prosecution indicated that it might call those persons as witnesses. Three of the grounds for relief raised in Mr. Zornes's habeas corpus petition—Grounds One, Three, and Six—relate to this removal and exclusion. In Ground One, Mr. Zornes contends that the removal and exclusion of individuals from the courtroom violated his Sixth Amendment right to a public trial. That claim was fairly presented to the Minnesota Supreme Court on direct appeal and is discussed in greater depth below. In Ground Six, Mr. Zornes contends that the prosecution submitted a witness list containing the names of persons that the State had no actual intention of calling as witnesses, thereby getting those individuals excluded from the courtroom, and thus committed prosecutorial misconduct. And in Ground Three, Mr. Zornes contends that his attorney's failure to object to what he believes to have been a "false" witness list amounted to ineffective assistance of counsel.

The claims presented in Grounds Three and Six were raised by Mr. Zornes in his first petition for post-conviction relief in state court. With respect to each claim, however, the Minnesota Supreme Court concluded that Mr. Zornes could have raised the issue on direct appeal and therefore that the claims were barred from further consideration by *Knaffla*. *See Zornes II*, 880 N.W.2d at 368-69 (citing *Knaffla*, 243 N.W.2d at 741). Because of the effect of *Knaffla*, neither Ground Three nor Ground Six has been presented to the Minnesota Supreme Court in a manner that entitled Mr. Zornes to a ruling on the merits. Moreover, *Knaffla* will continue to bar consideration

16

of those claims if raised in a future state-court proceeding. Accordingly, both claims are now procedurally defaulted.[4]

This procedural default can be overcome only through a showing either of cause and actual prejudice, or that a miscarriage of justice will occur if the claims are not reviewed. *See McCall*, 114 F.3d at 757. Mr. Zornes has not established any cause for the failure to raise the claims presented in Grounds Three and Six to the state courts at the appropriate time, much less cause justifying avoidance of the application of the usual rules of procedural default. Moreover, the claims in Grounds Three and Six are largely duplicative of the claim raised in Ground One of the habeas petition, which *has* been fairly presented to the Minnesota Supreme Court and is therefore amenable to federal habeas review. No miscarriage of justice will result from the denial of the largely duplicative Grounds Three and Six.

### 2. Grounds Four and Five

Grounds Four and Five of the habeas petition are also interrelated. Evidence regarding a blood-spattered chair found at the crime scene was admitted at trial. Mr. Zornes's trial counsel did not object to admission of the evidence. In Ground Five of the habeas petition, Mr. Zornes contends that the admission of the blood-spattered chair without adequate evidentiary foundation violated his constitutional rights. In

---

[4] Mr. Zornes did not argue before the state courts that his appellate counsel was ineffective for failing to raise the claims now presented in Grounds Three and Six of the habeas petition, and thus any such claim of ineffective assistance of appellate counsel would also be procedurally defaulted.

Ground Four of the habeas petition, Mr. Zornes contends that the failure to object to the admission of the evidence amounted to ineffective assistance of counsel.

The Minnesota Supreme Court squarely rejected each of these claims as barred by *Knaffla*. *See Zornes II*, 880 N.W.2d at 368-69. Mr. Zornes knew, or should have known, of these claims at the time he presented his direct appeal, yet he failed to raise these issues. *Knaffla* thus precluded those issues from being raised in Mr. Zornes's first petition for post-conviction review, and *Knaffla* continues to preclude those issues from being raised in the state courts now.[5] Accordingly, the claims raised in Grounds Four and Five have become procedurally defaulted.

Only through a showing of cause and prejudice, or manifest injustice, can Mr. Zornes overcome that procedural default. Again, Mr. Zornes has not demonstrated adequate cause for the failure to raise these claims related to the blood-spattered chair at the appropriate time before the state courts. Moreover, Mr. Zornes cannot show that manifest injustice would result from the refusal to consider Grounds Four and Five on the merits; indeed, the evidence at issue appears to have been marginal to the prosecution's case, and Mr. Zornes does not make clear how he believes that further "foundation" for the evidence presented would have helped his defense. It is also

---

[5] *Knaffla* would not necessarily have barred a claim of ineffective assistance of appellate counsel related to the blood spatter—e.g., that Mr. Zornes's appellate counsel was ineffective in failing to raise the issue on direct appeal—but Mr. Zornes did not present such a claim to the Minnesota courts, and it is now too late to do so.

unclear how Mr. Zornes alleges he was prejudiced by the introduction of the chair. Grounds Four and Five should therefore be dismissed as procedurally defaulted.

### 3. Ground Seven

Police took DNA samples from Mr. Zornes's cheek and penis shortly after his arrest. A warrant for the search was not obtained for another three and a half hours. *Zornes I*, 831 N.W.2d at 616. Mr. Zornes successfully had the results of that DNA testing suppressed.[6] *Id.* But the issue of DNA testing nevertheless arose at trial, with an expert testifying on behalf of the prosecution that she had obtained known samples from the two victims and two other persons, E.M. and B.K.; that the items found at Mr. Zornes's campsite contained male DNA; and that the DNA did not match the profiles of the victims, E.M., or B.K. Mr. Zornes contends that the line of questioning was a roundabout method of eliciting testimony regarding evidence that had been suppressed; the jurors would have intuited from the testimony, Mr. Zornes argues, that his DNA had been found on the items recovered from the campsite. In addition, Mr. Zornes contends that the DNA expert was untruthful when she testified that she had samples from only the victims, E.M., and B.K., as she also had the samples unlawfully taken from Mr. Zornes.

---

[6] Not suppressed was an ambiguous but incriminating statement made by Mr. Zornes around the time of the DNA collection that tended to implicate him in the offenses. The propriety of the admission of that statement was a focus of Mr. Zornes on direct appeal, *see Zornes I*, 831 N.W.2d at 621-24, but the claim was not renewed in his habeas petition.

These claims were among the alleged "trial errors" identified by the Minnesota Supreme Court that should have been raised on direct review. *See Zornes II*, 880 N.W.2d at 368. "Because Zornes's claims of trial error are all based on events that occurred during his trial, they were all known or should have been known at the time of the direct appeal," and thus the *Knaffla* bar applied to those claims. *Id.* Similarly, ineffective-assistance-of-trial-counsel claims related to the putatively improper testimony could have been raised on direct appeal; because the ineffective-assistance claims were not raised at that time, those claims were likewise barred by *Knaffla*.[7] *Id.* at 369. Mr. Zornes has not and cannot fairly present the claims raised in Ground Seven to the Minnesota Supreme Court. No adequate cause exists for the failure to raise the claims at the appropriate time, and no manifest injustice results from the refusal to consider it in the first instance. Ground Seven should be denied.

### 4. Ground Twelve

Mr. Zornes contends that one of the jurors demonstrated bias against Native Americans during voir dire—Mr. Zornes himself is Native American—while another juror expressed admiration of the county sheriff and admitted to having previously interacted with other persons involved in the trial, including the judge and defense

---

[7] Mr. Zornes did not raise a correlative ineffective-assistance-of-appellate-counsel claim before the Minnesota Supreme Court.

counsel.[8]  In Ground Twelve, Mr. Zornes argues that his counsel provided ineffective assistance by declining to strike those jurors from the panel.  By his own admission, Mr. Zornes had presented neither the claim of juror bias nor a claim of ineffective assistance of counsel for failure to strike the jurors in the state courts at the time that he filed his habeas petition.  *See* Petition at 23.  Ground Twelve was among the claims that Mr. Zornes sought to exhaust in his second petition for post-conviction review following the imposition of the *Rhines* stay in this matter.

The Minnesota Supreme Court made short work of the claim.  "Zornes's claims of ineffective assistance of counsel for failure to strike biased jurors can be determined on the basis of the trial record. . . .  Because these claims were known at the time of trial and were not raised during the direct appeal, the *Knaffla* rule bars the claims, unless the facts alleged in the petition establish one of the exceptions to the *Knaffla* rule."  *Zornes III*, 903 N.W.2d at 421.  No exception to *Knaffla* was found to apply by the Minnesota Supreme Court, and the claim was therefore rejected without consideration of the merits.  Mr. Zornes has failed to fairly present his claims to the Minnesota courts, and, once more, Mr. Zornes has demonstrated neither adequate cause for the failure nor that a manifest injustice would result from a refusal to

---

[8] Mr. Zornes mentions only the juror alleged to have demonstrated racial bias in the habeas petition itself, *see* Petition at 23; he includes the allegations regarding the second juror in his initial memorandum in support of his habeas petition, *see* ECF No. 19 at 28-30.

21

consider the claims. Ground Twelve should therefore also be denied on the grounds of procedural default.

### E. "Mixed" Grounds

Each of the six grounds for relief discussed above has not been not fairly presented to the Minnesota Supreme Court, and none of those grounds may now be raised in a new state-court proceeding. Accordingly, those claims have become procedurally defaulted in full, and denial of those grounds was recommended above on that basis.

By contrast, Grounds Eight, Nine, Ten, and Eleven of the habeas petition include both claims that have been fairly presented and claims that have not been fairly presented in the state courts. Each of Grounds Eight, Nine, and Ten concern alleged prosecutorial misconduct committed during closing arguments. The claims presented there were initially raised in Mr. Zornes's first petition for post-conviction review. In affirming the denial of that petition, the Minnesota Supreme Court concluded that Mr. Zornes could have raised the claims of prosecutorial misconduct on direct appeal and thus that those claims were barred by *Knaffla*. *See Zornes II*, 880 N.W.2d at 368-69. By the same token, the Minnesota Supreme Court concluded that Mr. Zornes could have raised any claims of ineffective assistance of *trial* counsel regarding the alleged prosecutorial misconduct on direct appeal. *Id.* at 369. But Mr. Zornes could not argue on direct appeal that his appellate counsel was ineffective for failing to raise issues related to the alleged prosecutorial misconduct; accordingly,

*Knaffla* did not bar consideration of his ineffective-assistance-of-appellate-counsel claims. Those claims were instead considered and denied on the merits by the Minnesota Supreme Court. *Id.* at 370-73.

Similarly, Ground Eleven consists of multiple claims. In part, Mr. Zornes contends that the prosecution and law enforcement failed to investigate matters that he insists would have exonerated him if pursued. In other claims, Mr. Zornes contends that the prosecution failed to turn over evidence favorable to him. On review of the denial of Mr. Zornes's second petition for post-conviction review, the Minnesota Supreme Court concluded that the investigatory claims could have been raised earlier and therefore were barred by *Knaffla*, but the court proceeded to the merits of the remaining claims now raised in Ground Eleven. *See Zornes III*, 903 N.W.2d at 417-19, 421.

Thus, in each of Grounds Eight, Nine, Ten, and Eleven, Mr. Zornes has raised claims that have been fairly presented to the state courts alongside claims that have become procedurally defaulted. Those claims that have become procedurally defaulted—the claims of prosecutorial misconduct and ineffective assistance of trial counsel in Grounds Eight, Nine, and Ten; and the investigatory claims in Ground Eleven—should be denied because of that procedural default. But this Court now considers the merits of the remaining claims.

1. Ground Eight

Mr. Zornes contends in Ground Eight of his petition that the prosecutor alluded to his invocation of his Fifth Amendment right against self-incrimination on several occasions during closing arguments; that his appellate counsel failed to raise the issue on direct appeal; and that the failure to do so amounted to ineffective assistance of appellate counsel. *See United States v. Triplett*, 195 F.3d 990, 995 (8th Cir. 1999) ("It is . . . well established that prosecutorial misconduct occurs when the prosecutor comments at trial, directly or *indirectly*, on the defendant's failure to testify."). Mr. Zornes is correct in part: the prosecutor did improperly allude to Mr. Zornes's decision not to testify, though only once; and his appellate attorney did not raise the issue on direct appeal. Because the decision not to litigate the claim before the Minnesota Supreme Court was reasonable, however, Mr. Zornes's appellate attorney did not provide ineffective assistance of counsel.

Claims of ineffective assistance of appellate counsel, like all ineffective-assistance claims, are governed by the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).[9] To prevail, Mr. Zornes must show that his counsel's performance fell below an objective standard of reasonableness, and that there is a

---

[9] "The right to counsel at trial is guaranteed by the Sixth Amendment, but the Fifth Amendment due process clause governs the right to counsel for appellate proceedings." *Steele v. United States*, 518 F.3d 986, 988 (8th Cir. 2008). The *Strickland* test is applied to both sets of claims. *See Williams v. Ludwick*, 761 F.3d 841, 845 (8th Cir. 2014).

24

reasonable probability that, but for his counsel's errors, the result of his proceeding would have been different. *Id.* at 687-88 & 94; *accord Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir. 2005). "[A]bsent contrary evidence," the Court must "'assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy." *United States v. Brown*, 528 F.3d 1030, 1033 (8th Cir. 2008) (quoting *Roe v. Delo*, 160 F.3d 416, 418 (8th Cir. 1998)). "Because one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be held to be ineffective for failure to raise every conceivable issue." *Link v. Luebbers*, 469 F.3d 1197, 1205 (8th Cir. 2006). In general, only if an omitted claim is clearly stronger than the issues that were raised can a petitioner demonstrate ineffectiveness on the part of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (quotation omitted). And on habeas review, claims of ineffective assistance of counsel are "doubly deferential"; counsel is presumed to have provided adequate assistance, while the decision of the state court denying the claim of ineffective assistance is afforded deference under § 2254(d). *See Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

Mr. Zornes alleges that his Fifth Amendment rights were violated when the prosecutor referred in her closing argument to his decision not to testify at trial. *See* Petition at 19; ECF No. 19 at 22-23. Mr. Zornes is not terribly precise in his habeas petition or accompanying documents in identifying the instances in which he believes the prosecutor stepped over the line. But in his briefing before the Minnesota Supreme Court on appeal from the denial of his first petition for post-conviction

relief, Mr. Zornes cited fifteen instances in which the prosecutor allegedly referred to his decision not to testify. *See* ECF No. 40-4 at 22-23. But as the Minnesota Supreme Court correctly pointed out, "the large majority of these references are not to Zornes' decision not to testify, but rather to statements made by Zornes following the crime, which were entered into evidence through witness testimony." *Zornes II*, 880 N.W.2d at 372. For example, where the prosecutor stated (in reference to Mr. Zornes) that "he's got some explaining to do," Tr. 1387, it was in the context of describing Mr. Zornes's actions and motivations in the days after the murder, consistent with testimony provided by witnesses at trial, *see id.* ("It's also on February 20th that the explanations start coming from this defendant because the people in this community know he was supposed to pick up [Ms. Londo], they were supposed to ride together, and [Ms. Londo] is dead and he is not and he's got some explaining to do.").

Two of the comments made by the prosecutor do not fit this description. The first comment was similarly innocuous. Mr. Zornes accurately quotes the prosecutor as stating in her closing statement that "it would be nice to know [a] motive," Tr. 1391, but the broader context of the quote makes clear that the prosecutor was not alluding to Mr. Zornes's decision to remain silent, but was explaining away a shortcoming in the State's case, *see id.* ("And it's also important to know that — it would be nice to know [a] motive for these brutal homicides, but motive is not an element of any offense with which this defendant is charged. And motive does not

26

need to be proven."). This reference cannot reasonably be interpreted as a reference to Mr. Zornes's decision not to testify.

The second comment, however, is a different matter. Near the end of her closing statement, the prosecutor remarked, in reference to the remnants of the smoke detector found in Mr. Cadotte's charred vehicle, that "some things can't be explained. [Mr. Zornes] can't explain that smoke detector." Tr. 399. The comment drew an immediate objection from defense counsel. *Id.* The trial court declined to declare a mistrial, but Mr. Zornes later requested and received an instruction that the jury was not to draw an adverse inference from his decision not to testify. *See Zornes II*, 880 N.W.2d at 373. Unlike the other comments referenced by Mr. Zornes, the prosecutor's statement that "some things can't be explained. [Mr. Zornes] can't explain that smoke detector" can reasonably be interpreted as a reference to the decision not to testify and thus arguably amounts to prosecutorial misconduct. Nevertheless, the Minnesota Supreme Court concluded that the comment of the prosecutor was "at most harmless error, and thus his appellate attorney was not ineffective by failing to raise the issue on appeal." *Id.*

"A claim of appellate ineffectiveness can be based on counsel's failure to raise a particular issue on appeal, although it is difficult to show deficient performance under those circumstances because counsel 'need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'" *Cargle v. Mullen*, 317 F.3d 1196, 1202 (10th Cir.

27

2003) (quoting *Smith*, 528 U.S. at 288). The standard is helpfully summarized in this context by *Cargle*:

> If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

*Cargle*, 317 F.3d at 1202. "[I]t is . . . possible to bring a *Strickland* claim based on [appellate] counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Smith*, 528 U.S. at 765.

Although Mr. Zornes's direct claim of prosecutorial misconduct is not properly before the Court on habeas review—again, that claim has been procedurally defaulted—the relative merit of that challenge, as compared to the issues that *were* raised on appeal, is relevant to determining whether Mr. Zornes's appellate counsel acted reasonably in omitting the claim on direct appeal. Mr. Zornes raised four issues on direct appeal. All had some merit, and at least one—the claim that Mr. Zornes was denied his Sixth Amendment right to a public trial—was very strong, as explored below. Conversely, in denying Mr. Zornes's claim of ineffective assistance of appellate counsel, the Minnesota Supreme Court signaled after conducting a harmless-error review that it would not have found the prosecutorial-misconduct claim

compelling had it been appropriately raised. Similarly, it is doubtful that, had the issue been preserved, the direct claim of prosecutorial misconduct would have been successful on federal habeas review. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (requiring a showing on habeas review that the petitioner demonstrate that the trial error had a substantial and injurious effect on the jury's verdict). The comment of the prosecutor that Mr. Zornes "can't explain that smoke detector," though impermissible, was an indirect reference to the decision not to testify. This mistake was made only once by the prosecutor. Mr. Zornes sought and received a no-adverse-inference jury instruction. And the evidence of Mr. Zornes's guilt—even after discounting evidence regarding possession of the possible murder weapons, see discussion of Ground Two below—was substantial. *See Zornes I*, 831 N.W.2d at 623.

The Minnesota Supreme Court reasonably concluded that Mr. Zornes would not have succeeded on his prosecutorial-misconduct claim had the claim been raised before it on direct review. Accordingly, the decision of Mr. Zornes's appellate attorney not to raise the issue on direct appeal could not have been objectively unreasonable. *See Dyer v. United States*, 23 F.3d 1424, 1426 (8th Cir. 1994). The claim of ineffective assistance of appellate counsel raised in Ground Eight should be denied.

### 2.  Ground Nine

The prosecution is alleged to have committed two other acts of misconduct during closing arguments, and Mr. Zornes's appellate attorney is said to have provided ineffective assistance in failing to raise those instances of misconduct on direct appeal.

29

In Ground Nine, Mr. Zornes contends that the prosecutor conducted her closing argument in an overly inflammatory manner, thus depriving him of due process. This Court considers the argument within the context of an ineffective-assistance-of-appellate-counsel claim: Was Mr. Zornes's appellate counsel constitutionally deficient in failing to raise this instance of alleged prosecutorial misconduct on direct appeal?

The claim was not well developed before the Minnesota Supreme Court,[10] and it is not well developed here. It is true that comments intended solely to inflame juror emotions are inappropriate and that, where such comments deprive a defendant of a fair trial, reversal is warranted. *See, e.g.*, *United States v. Tulk*, 171 F.3d 596, 599 (8th Cir. 1999). But the comments of the prosecutor cited by Mr. Zornes—counting from one to twenty-one to represent the number of blows landed on one victim—are not too incendiary, all things considered. Further, the comments were directed towards a legitimate purpose: establishing that Mr. Zornes acted with the requisite premeditation to be convicted of first-degree murder rather than second-degree murder. *See* Tr. 1392.

---

[10] The Minnesota Supreme Court understandably elided this aspect of Mr. Zornes's claim with its discussion of the related claim, brought in Ground Ten, that the prosecutor improperly presented evidence through a PowerPoint presentation used during closing arguments. *See Zornes II*, 880 N.W.2d at 371. But Mr. Zornes did present the argument regarding inflammatory conduct before the Minnesota Supreme Court as a separate and discrete claim for relief. *See* ECF No. 40-4 at 25-26.

The claim of prosecutorial misconduct raised in Ground Nine had little hope of securing a favorable result for Mr. Zornes on direct appeal.  His attorney acted reasonably in declining to pursue a marginal claim, thereby detracting from the four substantially more viable claims for relief that were in fact raised.  Mr. Zornes has not established that his appellate attorney's performance fell below an objective standard of reasonableness in this regard. *See Strickland*, 466 U.S. at 687-88.  Ground Nine therefore should be denied.

### 3.  Ground Ten

A final instance of alleged prosecutorial misconduct during closing arguments was presented by Mr. Zornes in his first petition for post-conviction review: Mr. Zornes claimed that the prosecutor used a PowerPoint slide that included information not admitted into evidence and that had not been shown to either the court or his defense attorney in advance.  As with the two claims just discussed, the Minnesota Supreme Court concluded that this claim was barred by *Knaffla* if presented directly as a claim of prosecutorial misconduct or if presented as a claim of ineffective assistance of trial counsel.  *See Zornes II*, 880 N.W.2d at 368-70.  The Minnesota Supreme Court went on to consider the claim in the context of ineffective assistance of appellate counsel but concluded, in essence, that the claim had been insufficiently pleaded.  "Zornes does not explain further which facts were included [in the presentation] that allegedly lacked evidentiary support.  Accordingly, he has not alleged facts that, if proven, would entitle him to relief." *Id.* at 371.

31

The Minnesota Supreme Court is correct that Mr. Zornes did not give it much to work with regarding this claim. The exact nature of the evidence alleged to have been introduced through the PowerPoint presentation remains even now somewhat unclear. The crux of the claim appears to concern photographs of the crime scene which, according to Mr. Zornes, were altered to include red indications in various spots.[11] *See* ECF No. 19 at 21; ECF No. 40-4 at 27. On the face of the transcript, the prosecution appears to have used these altered photographs to demonstrate where the smoke detector and carbon-dioxide detector had been removed from the room. *See* Tr. 1397. According to Mr. Zornes, however, the effect of the additional red coloration on the photograph was to make the crime scene appear more violent than it actually was.

One difficulty in evaluating this claim is that the PowerPoint presentation at issue is not in the record available to this Court. The Minnesota Supreme Court concluded that an evidentiary hearing on the claim was unnecessary given the dearth of factual allegations in the petition for post-conviction review and subsequent briefing on appeal. Only in rare circumstances, not present in this case, may a court sitting in federal habeas corpus review of a state-court judgment hold an evidentiary

---

[11] Mr. Zornes also claims in his briefing before this Court that the prosecutor made a statement during closing arguments concerning the failure to test the fingernail clippings of Mr. Cadotte that was not supported by the evidence in the record, *see* ECF No. 19 at 21, but this claim was not presented to the Minnesota Supreme Court, *see* ECF No. 40-4 at 27.

hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2). By failing to adequately allege what, exactly, the prosecution had disclosed through the presentation that was not admitted into evidence (other than the red highlighted pictures), Mr. Zornes forfeited his chance for further evidentiary development in the state courts. Therefore, under § 2254(e)(2), cannot be afforded an evidentiary hearing on the issue in federal court, either.

The question, then, is whether the allegations regarding the PowerPoint presentation offered by Mr. Zornes, if assumed to be true, would entitle him to relief based on his appellate counsel's supposed ineffectiveness in failing to raise the issue on direct appeal. This Court concludes that the answer is no. Even assuming that the prosecutor during her closing argument used photographs of the crime scene that had been altered to indicate in red various items or places within those photographs, and even assuming that these alterations had a prejudicial tendency because they were evocative of blood, Mr. Zornes must still establish that his appellate counsel's failure to raise the issue on direct review fell short of the *Strickland* standard for professional conduct. As explained above, Mr. Zornes's appellate counsel raised four colorable claims for relief on direct review. "Where, as here, 'appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain an ineffective assistance claim based on allegations that counsel was deficient for failing to assert some other claims.' This is because one of appellate counsel's functions is to winnow

the available arguments and exercise judgment about which are most likely to succeed on appeal." *Gray v. Norman*, 739 F.3d 1113, 1117-18 (8th Cir. 2014) (quoting *Link*, 469 F.3d at 1205). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Smith*, 528 U.S. at 288. The claim that Mr. Zornes contends his appellate counsel should have raised on direct review either would have required, if raised as a direct prosecutorial-misconduct claim, surviving plain-error review, as no objection was lodged by trial counsel to the use of the exhibit at trial, *see State v. Ramey*, 721 N.W.2d 294, 298-300 (Minn. 2006); or, if raised as an ineffective-assistance claim, would have required a showing that, but for his counsel's errors, the result of his proceeding would have been different, *Strickland*, 466 U.S. at 694. Neither task would have been easy in light of the evidence arrayed against Mr. Zornes and the relatively fleeting and ephemeral nature of the alleged misconduct — items and locations on a photograph highlighted in red rather than a less sanguinary hue. Appellate counsel would have used reasonable professional judgment in concluding that other claims were more worth pursuing on direct appeal. Ground Ten should be denied.

### 4. Ground Eleven

In the section of his habeas corpus petition setting out Ground Eleven, Mr. Zornes asserts that forensic lab personnel were instructed by law enforcement not to perform DNA testing on fingernail clippings of the victims because, Mr. Zornes asserts, this DNA testing would have revealed that someone other than him

34

committed the crimes for which he was convicted. *See* Petition at 22. Mr. Zornes repeats this claim in the briefing supporting his habeas petition, but in that briefing he also provides six other instances in which he alleges that law enforcement and the prosecution either failed to investigate possible leads that would have established his evidence or, failed to turn over evidence favorable to the defense.

Although grouped into a single category of claims in his second petition for post-conviction review, the Minnesota Supreme Court separated the arguments presented in Ground Eleven of the habeas petition into claims arising under *Brady* and claims "that law enforcement officials did not sufficiently investigate the case." *Zornes III*, 903 N.W.2d at 420. Mr. Zornes's *Brady* claims concerned potentially exculpatory evidence that was *actually* possessed by law enforcement and the prosecution, but not turned over to the defense; Mr. Zornes's investigation claims concerned leads that he believed *would* have supplied exculpatory evidence had law enforcement followed up on those aspects of the investigation.

The Minnesota Supreme Court rejected the investigation claims as barred by *Knaffla*, as each of the supposed investigatory failures would have been known to Mr. Zornes and his attorneys on direct appeal. *Id.* at 420-21. Thus, for instance, it was too late for Mr. Zornes to pursue a claim in his second petition for post-conviction review on the theory that law enforcement should have conducted DNA testing of the victims' fingernail clippings, as Mr. Zornes knew at least by the time of trial that

such testing had not been conducted.  Due to the effect of *Knaffla*, these investigatory claims are now procedurally barred in federal court as well.[12]

By contrast, the Minnesota Supreme Court considered the merits of Mr. Zornes's *Brady* claims, presumably because, unlike the matters at issue in the investigatory claims, Mr. Zornes would not necessarily have known about specific pieces of exculpatory evidence that were not turned over to the defense and therefore could not have earlier raised claims under *Brady* concerning that evidence.  Mr. Zornes identified three such pieces of evidence: "The first document is the transcript of a police interview with M.K.M., a friend of Zornes.  The transcript shows that she informed the police that, after the murder, Zornes told her that [the female victim's] boyfriend, Mexican boyfriend had started their house on fire.  The second document is a transcript of a police interview with Zornes's sister.  The third is a narrative of a police interview with Zornes's friend M.P."  *Zornes III*, 903 N.W.2d at 417 (cleaned up).

To establish a *Brady* violation, Mr. Zornes is required to establish three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by

---

[12] Indeed, it is difficult to understand what constitutional hook would hold claims that the police should have pursued other leads.  Such arguments are certainly raised by able defense attorneys at trial, but they do not clearly implicate claims such as ineffective assistance or prosecutorial misconduct generally raised on either direct appeal or in habeas proceedings.

the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The Minnesota Supreme Court concluded that none of the three documents cited by Mr. Zornes gave rise to relief under *Brady*. This Court finds that each of those conclusions was reasonable.

First, as to the police interview of M.K.M., although the transcript at issue had not been turned over to the defense, a report and recording of another police interview with M.K.M. had been disclosed. The two interviews differed only in that M.K.M. informed police in the non-disclosed interview that the boyfriend of the victim (Ms. Londo), who was posited by Mr. Zornes to have started the fire, was Mexican. *Zornes III*, 903 N.W.2d at 419-20. The finding regarding the differences in the transcripts is a factual one presumed to be correct on federal habeas corpus review, *see* 28 U.S.C. § 2254(e)(1), and Mr. Zornes has not shown by clear and convincing evidence that the characterization of the factual record by the Minnesota Supreme Court was incorrect. What then remains of Mr. Zornes's claim regarding the police interview with M.K.M. is whether her description of Ms. Londo's boyfriend as "Mexican" was material such that prejudice would have ensued from the failure to disclose it. Mr. Zornes has not explained how or why that information was relevant to his defense, and the Court cannot discern an exculpatory use of that piece of information. Accordingly, the Minnesota Supreme Court's rejection of Mr. Zornes's *Brady* claim was reasonable.

Second, with respect to the transcript of the police interview with Mr. Zornes's sister, the Minnesota Supreme Court concluded that "the allegedly suppressed evidence was not material because it was readily available in other documents; accordingly, no reasonable probability exists that, had the evidence been disclosed to the defense, the result of the trial would have been different." *Zornes III*, 903 N.W.2d at 418. That the evidence in the transcript was duplicative of materials given to Mr. Zornes is a factual finding presumed to be correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). Mr. Zornes has not rebutted, or even attempted to rebut, that finding. Without such a rebuttal, Mr. Zornes cannot show that the transcript at issue was material, and his *Brady* claim thus falls short.

Third, with respect to the police interview with M.P., the trial court determined that the narrative of that interview *had*, in fact, been turned over to Mr. Zornes's counsel before trial. *See Zornes III*, 903 N.W.2d at 418. The Minnesota Supreme Court found that the record before it supported that conclusion. *Id.* Again, Mr. Zornes has not rebutted the presumption that this factual finding is correct. *See* 28 U.S.C. § 2254(e)(1). And, of course, if Mr. Zornes or his attorney actually received the interview at issue, he cannot prosecute a *Brady* claim premised on his failure to receive that interview.

In conclusion, the aspects of Mr. Zornes's claims in Ground Eleven regarding insufficient investigation are procedurally barred and his *Brady* claims fail on the merits. It is recommended that Ground Eleven be denied for those reasons.

*F. Fully Exhausted Grounds*

### 1. Ground One

Two persons were removed from the courtroom during the voir dire stage of

Mr. Zornes's trial.  The Minnesota Supreme Court explained the circumstances of the

removals as follows:

> E.M. was Zornes's girlfriend and was potentially a
> significant witness at trial.  In fact, E.M. played a key role in
> Zornes's planned alibi defense.  E.M. attended voir dire on
> October 18 and then again on October 19.  E.M. was on
> the joint witness list prepared by both sides.  On October
> 19, counsel brought to the district court's attention the fact
> that a potential witness was in the courtroom.  The court
> stated that witnesses were to be excluded during the trial
> process and that because the court "determined that voir
> dire selection is part of the trial process [the court] cannot
> allow any potential witnesses to be present."  The court
> went on to note that excluding witnesses from voir dire "is
> an intricate and complex legal issue that, frankly, we haven't
> researched before, but, it's [the court's] judgment that the
> safest thing to do is to order all witnesses sequestered
> throughout the voir dire process and the trial."  E.M. was
> then excluded from the courtroom for the remainder of the
> voir dire proceedings. . . .
>
> The circumstances leading to the removal of Cadotte's
> brother from the courtroom and his placement in an
> observation room are more complicated than the
> sequestration of E.M.  The day after the district court
> sequestered E.M., Zornes's trial counsel alerted the court to
> the fact that Cadotte's brother was in the courtroom during
> voir dire.  At the time, the brother was on the witness list.
> Zornes's trial counsel stated that it was his "understanding
> that the state may be willing to remove [the brother] from
> [the witness] list and in return we would not be objecting if
> [the brother] wants to watch from the observation room so
> we don't have the jurors in eye contact with him."  The

39

> State agreed to this proposal, removed the brother from the
> witness list, and allowed him to watch the trial proceedings
> from an observation room.

*Zornes I*, 831 N.W.2d at 618-19, 620 (citations and footnote omitted).  In his petition

for a writ of habeas corpus, Mr. Zornes argues that the enforced exclusion of the

E.M. and Mr. Cadotte's brother, and the implicit exclusion of everyone on the

prosecution's witness list, violated his Sixth Amendment right to a public trial.[13]  *See*

U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right

to a speedy and public trial . . . .").

"The traditional Anglo-American distrust for secret trials has been variously

ascribed to the notorious use of this practice by the Spanish Inquisition, to the

excesses of the English Court of Star Chamber, and to the French monarchy's abuse

of the lettre de cachet."  *In re Oliver*, 333 U.S. 257, 268-69 (1948).  Whatever the source

of the suspicion of closed proceedings, at least two states extended the right of public

trial to the accused at the time of the founding, and soon thereafter the right was

---

[13] The bulk of respondent's briefing on the public-trial claim frames the issue as one
of ineffective assistance of counsel.  As explained above, Mr. Zornes does contend in
Ground Three that his trial attorney provided ineffective assistance by failing to
object to the exclusion of witnesses.  But Mr. Zornes did not present such an
ineffective-assistance claim to the Minnesota Supreme Court, and the claim raised
Ground Three has thus been procedurally defaulted.  By contrast, Mr. Zornes fairly
presented his direct public-trial claim on direct appeal, *see Zornes I*, 831 N.W.2d at 618-
21, and it is this direct claim that is renewed in Ground One of the habeas petition, *see*
Petition at 4.  Much of respondent's briefing on this issue is therefore unhelpful.

embedded within the federal constitution by way of the Sixth Amendment.[14]  *Id.* at 267 & n.15.  Yet for nearly two centuries the right as contained within the Sixth Amendment went largely unexplored by the Supreme Court of the United States.[15]

The Supreme Court filled this jurisprudential gap in *Waller v. Georgia*, 467 U.S. 39 (1984).  In *Waller*, a trial court of the State of Georgia closed itself to the public during the course of a seven-day suppression hearing.  *Id.* at 41-43.  The *Waller* court concluded that the Sixth Amendment public-trial rights of the accused had been infringed by the closure.  *Id.* at 48-49.  In so concluding, the Supreme Court set out what is now the controlling test: "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure."  *Id.* at 48.

---

[14] The general principle of openness in criminal proceedings extends still further back in American jurisprudence; William Penn's Code of Laws of 1682 included a guarantee "[t]hat all courts shall be open . . . ."  *Commonwealth ex rel. Paylor v. Cavell*, 138 A.2d 246, 249 (Pa. 1958) (quotation omitted).  Indeed, a kernel of the right can be traced back to the Norman Conquest.  *See Press-Enterprise Co. v. Superior Court of Cal., Riverside Cty.*, 464 U.S. 501, 505 (1984).

[15] In *Oliver*, the Supreme Court expressly founded such a right as applied to the states through the due process clause of the Fourteenth Amendment, largely without reference to the Sixth Amendment  *In re Oliver*, 333 U.S. at 258, 275-76.  The First Amendment likewise guarantees the right of public trial, but to those who would attend as bystanders rather than those who stand accused of criminal offenses.  *See Press-Enterprise Co.*, 464 U.S. at 508-10.

As relevant here, two questions remained open in the wake of *Waller*. First, to what proceedings does the Sixth Amendment right to a public trial extend? No doubt difficult cases remain to be decided on that question, *see State v. Smith*, 876 N.W.2d 310, 341-43 (J. Stras, concurring), but this is not one of them. In 2010, the Supreme Court held in *Presley v. Georgia* that the Sixth Amendment public-trial right extends to voir dire proceedings. 558 U.S. 209, 213 (2010) (per curiam). In addition, *Presley* applied the four-part test set forth in *Waller* to the voir dire closure there before the court. *Id.* at 214. Any suggestion to the contrary—that is, any suggestion that applying a different or lesser standard to voir dire closures than that set forth in *Waller*—would be a decision contrary to clearly established federal law as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1).

The second question remaining open following *Waller* is trickier for present purposes. Both *Waller* and *Presley* involved instances of *total* closure—i.e., instances in which all members of the public had been excluded from the courtroom.[16] What, though, of instances of *partial* closure—i.e., instances in which some, but not all, members of the public are excluded from the courtroom? The Supreme Court has remained mute on the question, but the several circuit courts to take up the issue on direct appellate review, including the Eighth Circuit, "have required only a 'substantial

---

[16] *Presley* concerned the exclusion of a "lone courtroom observer"—the defendant's uncle—from the courtroom during voir dire. *See Presley*, 558 U.S. at 210. The trial court's conclusion in that matter, however, demonstrated that *any* observer would have been excluded had they tried to attend. *Id.* at 210.

reason' for the partial closure, instead of the stringent 'overriding interest' required by *Waller*." *Garcia v. Bertsch*, 470 F.3d 748, 752-53 (8th Cir. 2006) (citing *United States v. Osborne*, 68 F.3d 94, 98-99 (5th Cir. 1995) and *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994)); *accord United States v. Simmons*, 797 F.3d 409, 414 (6th Cir. 2015) ("All federal courts of appeals that have distinguished between partial closures and total closures modify the *Waller* test so that the 'overriding interest' requirement is replaced by requiring a showing of a 'substantial reason' for a partial closure, but the other three factors remain the same."). In all respects other than the lesser requirement of a "substantial reason," though, the *Waller* test has been applied unaltered by federal appellate courts to instances of partial closure.

The Minnesota Supreme Court, by contrast, applied neither the *Waller* test nor the modified *Waller* test. Rather, the Minnesota Supreme Court took a third approach towards the exclusion of E.M. and a fourth approach towards the exclusion of Mr. Cadotte's brother. With respect to E.M., the Minnesota Supreme Court concluded, reasoning from *Geders v. United States*, 425 U.S. 80, 87 (1976) and *Perry v. Leeke*, 488 U.S. 272 (1989), that the trial court has near-total discretion to sequester potential witnesses during trial. *See Zornes I*, 831 N.W.2d at 618-20 (citing, inter alia, *State v. Posten*, 302 N.W.2d 638, 640 (Minn. 1981) (stating that, "while discretionary, in practice sequestration [of witnesses] is rarely denied in criminal cases and rarely should be denied.")).

That same reasoning, however, could not be applied to the exclusion of Mr. Cadotte's brother, who had been removed from the prosecution's witness list by the time he had been excluded from the courtroom. Instead the Minnesota Supreme Court concluded, relying on its previous decision in *State v. Lindsey*, 632 N.W.2d 652, 660-61 (Minn. 2001), "that not all courtroom restrictions implicate a defendant's Sixth Amendment right to a public trial" and that the removal of Mr. Cadotte's brother "was too trivial to implicate Zorne's [sic] Sixth Amendment right to a public trial." *Zornes I*, 831 N.W.2d at 620.

The undersigned is not the first to have "great difficulty squaring the Minnesota Supreme Court's rule—and the triviality exception on which it relies—with the clearly established federal law of the Supreme Court of the United States." *Smith v. Smith*, No. 17-CV-0763 (JRT/TNL), 2018 WL 3696601, at *7 (D. Minn. Aug. 3, 2018). Nothing in *Waller* or *Presley* implies such a triviality exception. Quite the opposite, in fact: *Waller* stresses the attachment of Sixth Amendment rights to "*any* closure." *Waller*, 467 U.S. at 47 (emphasis added); *see also Smith*, 2018 WL 3696601, at *8.

Moreover, the Minnesota Supreme Court's triviality analysis in this matter is vulnerable to attack on its own terms. Only Mr. Cadotte was actually removed from the courtroom after entering, but by all indications, every person listed on the prosecution's witness list—one hundred and eighty-four total—would have been removed had the need arisen. Regardless of the freedom invested in trial courts to

44

sequester witnesses, *see Leeke*, 488 U.S. at 600-01, by the time of voir dire, the government had become aware that the testimony of quite a few of the listed individuals would no longer be relevant to the prosecution, *see* ECF No. 59-1. Yet those persons, too, would not have been permitted to enter the courtroom due to their continuing presence on the witness list. Like straws atop a camel, the exclusion of non-witnesses no doubt must add up at some point, turning what might have been a "trivial" closure (if such a thing exists) into a non-trivial closure. Yet the Minnesota Supreme Court did not confront this issue.

The trouble for Mr. Zornes, however, is that what is being challenged in this habeas corpus proceeding is not the *reasoning* of the Minnesota Supreme Court or its triviality analysis, but the *decision* of the Minnesota Supreme Court and its conclusion that Mr. Zornes's Sixth Amendment right to a public trial was not violated. *See* 28 U.S.C. § 2254(d)(1); *Dansby v. Hobbs*, 766 F.3d 809, 830 (8th Cir. 2014) (*citing Williams v. Roper*, 695 F.3d 825, 833-37 (8th Cir. 2012)); *accord Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). Moreover, Mr. Zornes must show not only that the Minnesota Supreme Court was wrong, but that the decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Most critically, the error must be one resulting in a decision that is contrary to or that unreasonably applies federal law *as determined by the Supreme Court of the United States itself. See* 28 U.S.C. § 2254(d)(1). This standard is "difficult to meet" under any

circumstances. *Harrington*, 562 U.S. at 102.  Given the paucity of Supreme Court case law on the issue of partial closures, the standard might accurately be described as impossible to meet on the specific partial-close claim raised by Mr. Zornes.

First, assuming (as this Court does) that, pursuant to *Waller* and *Presley*—and contrary to the reasoning of the Minnesota Supreme Court—Mr. Zornes's Sixth Amendment rights were implicated by the partial closure, neither *Waller* nor *Presley* expressly sets forth any standard for when the public-trial right is actually violated by a partial closure.  To be sure, the test in *Waller* can be read as applying to *any* closure, partial or complete.  In fact, the four-part test set forth in *Waller* appears to contemplate that less-than-complete closures fall within its ambit.  *See Waller*, 467 U.S. at 48 ("[T]he closure must be no broader than necessary to protect that [overriding] interest . . . ."); *cf. Oliver*, 333 U.S. at 271-72 ("[W]ithout exception all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."). Although this Court finds that the reading of *Waller* as applying to partial closures is the better one, the federal courts of appeals that have considered the issue have unanimously rejected such a reading.  *See, e.g.*, *Drummond v. Houk*, 797 F.3d 400, 402-04 (6th Cir. 2005);[17] *Garcia*, 470 F.3d at 754.  Perhaps those courts have all been

---

[17] The Sixth Circuit originally concluded in *Drummond*, on habeas review, that the Sixth Amendment rights of the defendant had been violated by a partial closure.  *See Drummond v. Houk*, 728 F.3d 520, 526-30 (6th Cir. 2013).  The Supreme Court tersely vacated the judgment and remanded in light of *White v. Woodall*, 572 U.S. 415 (2014),

wrong, but their unanimity cannot be chalked up to each of court having unreasonably applied federal law in a way that is beyond the scope of fair-minded disagreement among jurists.

Second, what those appellate courts have adopted for consideration of partial closures is the modified test that substitutes the "overriding interest" requirement of *Waller* with the lesser showing of a "substantial reason," while leaving the other prongs of the *Waller* test intact. *See, e.g.*, *Simmons*, 797 F.3d at 413-14. The decision of the Minnesota Supreme Court is vulnerable to attack under this modified *Waller* test as well: the trial court offered *no* findings on the record to support the exclusion of non-witnesses such as Mr. Cadotte's brother, much less reasons adequate to support the substantial interest in the closure.[18] But the modified *Waller* test applied by the federal courts of appeals is not "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This Court is constrained by the standard of review set forth in § 2254(d)(1). Until the Supreme Court weighs in on the question of what standard applies under the Sixth Amendment

---

in which the inferior courts were again reminded at length of the standard established by § 2254(d)(1). *See Robinson v. Drummond*, No. 13-496, 134 S. Ct. 1934 (Apr. 28, 2014).

[18] Respondent contends that Mr. Cadotte's brother was removed because "[h]e was visibly expressive and openly emotional throughout the court process; it was apparent to everyone present in the courtroom." ECF No. 59 at 10. No citation to the record is provided for this observation, and the relevant portion of the voir dire transcript reflects no such concern.

to partial closures of criminal proceedings, habeas petitioners proceeding under § 2254 cannot establish that a partial closure amounts to a clear violation of their constitutional rights under clearly established federal law within the meaning of § 2254(d)(1).

Mr. Zornes's partial-closure claim therefore falls within a frustrating jurisprudential gap.  In rejecting Mr. Zornes's public-trial claim, the Minnesota Supreme Court applied a triviality analysis untethered to the decisions of the Supreme Court of the United States on the issue.  But those Supreme Court decisions do not expressly apply to partial closures of the kind at issue in this matter.  The federal appellate courts have filled this gap by applying their own modified *Waller* test to partial closures, and the decision of the Minnesota Supreme Court does not satisfy this test, either.  But the modified *Waller* test is not " clearly established Federal law, *as determined by the Supreme Court of the United States*."  28 U.S.C. § 2254(d)(1) (emphasis added).  Thus, as far as habeas corpus review goes, *no* finding of the state courts regarding a partial closure, no matter how apparently erroneous as a matter of federal law, can be found to satisfy § 2254(d)(1).

Nevertheless, because the decision cannot be said to contradict or amount to an unreasonable application of clearly established federal law as determined by the Supreme Court, Mr. Zornes is not entitled to habeas corpus relief.  Ground One must be denied.

## 2.  Ground Two

At trial, defense counsel sought to have the pocketknife, utility knife, scissors, screwdriver, and hammer found on or near Mr. Zornes at the time of his arrest excluded as lacking relevance—nothing directly tied the items to the crime scene—and therefore inadmissible under the Minnesota Rules of Evidence.  The trial court rejected the argument and admitted the items,[19] finding that the tools were arguably consistent with the types of things that had been used to kill Ms. Londo and Mr. Cadotte.  *See Zornes I*, 831 N.W.2d at 625-26.  The Minnesota Supreme Court found on direct appeal that the admission of the items as evidence did not amount to an abuse of discretion by the trial court.  *Id.*

In his first petition for post-conviction review in state court, Mr. Zornes renewed his argument regarding the admissibility of the pocketknife, this time in the form of an argument regarding ineffective assistance of counsel.  Autopsy reports from the time of the trial revealed that some of the wounds found on the victims likely could not have been caused by the pocketknife entered into evidence.  Defense counsel, however, did not press this wound-incompatibility argument in seeking to have the pocketknife excluded.  Mr. Zornes argued that his failure to press this argument amounted to ineffective assistance.

---

[19] Only the folding knife and hammer were mentioned by the prosecution at trial.  *See Zornes I*, 831 N.W.2d at 626.

The trial court rejected the ineffective-assistance claim as barred by *Knaffla*, but the Minnesota Supreme Court proceeded to the merits of the claim. "It is true that counsel did not make the argument that the knife was incapable of inflicting the specific wounds Zornes points to in the autopsy reports," explained the Minnesota Supreme Court. "However, counsel could reasonably have concluded that this argument should not be pursued because, according to the same autopsy reports, the victims *did* have wounds (such as those on their ears) that could have been produced by the knife in question." *Zornes II*, 880 N.W.2d at 370. The pocketknife therefore remained relevant as a matter of Minnesota law, *see id.* at 370 n.4 (citing *State v. Daniels*, 361 N.W.2d 819, 827 (Minn. 1985)), and trial counsel did not provide ineffective assistance in pursuing what likely would have been a losing argument under the Minnesota Rules of Evidence. Moreover, notwithstanding the admission of the items as evidence, Mr. Zornes's trial counsel emphasized to the jury the tenuous connection between the recovered items and the crime scene throughout the trial. "On these facts," the Minnesota Supreme Court concluded, "Zornes cannot overcome the strong presumption that his trial counsel's performance was reasonable." *Zornes II*, 880 N.W.2d at 370. In Ground Two of his habeas petition, Mr. Zornes argues that the Minnesota Supreme Court's decision on his ineffective-assistance claim involved an unreasonable application of clearly established federal law.

It is worth noting at the outset what Mr. Zornes's claim is *not*. Mr. Zornes is not claiming, and indeed he cannot claim in this federal habeas corpus proceeding,

that the decision of the trial court to admit the items found at the time of his arrest was erroneous or an abuse of discretion as a matter of Minnesota law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997). Nor is Mr. Zornes claiming that the admission of the items into evidence itself amounted to a violation of his federal constitutional (e.g., due process) rights. *See Wallace v. Lockhart*, 701 F.2d 719, 724 (8th Cir. 2013) ("[Q]uestions concerning the admissibility of evidence are matters of state law and are not reviewable in a federal habeas corpus proceeding unless the asserted error infringed a specific constitutional protection or was so prejudicial as to deny due process."). Moreover, even if he were raising such a due-process claim in his habeas petition, Mr. Zornes did not raise that claim before the Minnesota Supreme Court, rendering any such federal due-process claim now procedurally defaulted.

What is raised by Mr. Zornes in Ground Two of his federal habeas corpus petition is an ineffective-assistance claim, which does implicate a federal constitutional right. Moreover, unlike a due-process claim derived from the admission of the items into evidence, Mr. Zornes fairly presented the ineffective-assistance claim to the Minnesota Supreme Court on appeal from the denial of his first petition for post-conviction relief. *See Zornes II*, 880 N.W.2d at 369-70.

But at bottom, Mr. Zornes's ineffective-assistance claim depends upon the viability of his underlying state-law claim about the inadmissibility of the evidence. If his trial counsel would not have succeeded in getting the items excluded from evidence had he made the wound-incompatibility argument later raised, then the attorney's performance could not have fallen below an objective standard of reasonableness in failing to make that argument. *See Strickland*, 466 U.S. at 687-88. In affirming the denial of Mr. Zornes's ineffective-assistance claim, the Minnesota Supreme Court intimated that the items would have been admissible even if shown to be incapable of producing some of the wounds found on the victims, because "the victims *did* have wounds (such as those on their ears) that could have been produced by the knife in question." *Zornes II*, 880 N.W.2d at 370 (citing *Daniels*, 361 N.W.2d at 827 (approving admission into evidence of gun that, "[w]hile definitely not the gun which fired the fatal shot . . . could well have been one of the guns used in the crime . . . .")).

The state courts' conclusions regarding the admissibility of the items as a matter of state law are controlling and ultimately determinative of the ineffective-assistance claim. Because Mr. Zornes's attorney could not have succeeded in getting the evidence excluded, he could not have rendered ineffective assistance by failing to make a particular argument as to why that evidence should have been excluded. Ground Two must therefore be rejected.

3.  Ground Thirteen

Ground Thirteen of the habeas petition, the final claim raised by Mr. Zornes, is in large part a continuation of the claim raised in Ground Two.  Following his conviction, Mr. Zornes commissioned a forensic report from Dr. Marcella Fierro. Dr. Fierro concluded, consistent with the autopsy reports created prior to trial, that the items recovered from Mr. Zornes at the time of his arrest could not have caused some of the wounds found on the victims.  *See* ECF No. 32-8 at 1-5.  In his second petition for post-conviction review in state court, Mr. Zornes sought a new trial on the basis of newly discovered evidence, namely Dr. Fierro's report.  The Minnesota Supreme Court, reviewing the claim as a matter of state law, concluded that Dr. Fierro's report did not entitle Mr. Zornes to a new trial "because it was already established at trial that it was not possible to conclusively prove 'that the victims' wounds were caused by the specific tools found at the campsite.'"  *Zornes III*, 903 N.W.2d at 420 (quoting *Zornes II*, 880 N.W.2d at 370).

Mr. Zornes is correct that the Minnesota Supreme Court's summarization of his claim, and Dr. Fierro's report, leaves something to be desired.  The crux of Mr. Zornes's argument is not, as the Minnesota Supreme Court put it, that the prosecution failed to conclusively show that the items seized from him upon arrest caused the death of the victims, though this is true.  *See Zornes III*, 903 N.W.2d at 420. Rather, Mr. Zornes's argument is that the forensic analysis affirmatively established

that those items *could not* have caused some of the wounds found on Ms. Londo and

Mr. Cadotte.

That said, Mr. Zornes's claim nevertheless falls short. To begin, it is not

entirely clear what claim Mr. Zornes is raising, or could raise, in this federal habeas

corpus proceeding based on Dr. Fierro's forensic report. In his petition for post-

conviction review, Mr. Zornes presented his claim as one of entitlement to a new trial

under state law based on the newly discovered evidence. *See Zornes III*, 903 N.W.2d

at 419 (citing *Rainer v. State*, 566 N.W.2d 692, 695 (Minn. 1997)). But "it is not the

province of a federal habeas court to reexamine state-court determinations of state-

law questions. In conducting habeas review, a federal court is limited to deciding

whether a conviction violated the Constitution, laws, or treaties of the United States."

*Estelle*, 502 U.S. at 67-68.

Mr. Zornes appears to conceive of the claim raised in Ground Thirteen as one

of actual innocence based on the putatively newly discovered evidence of Dr. Fierro's

report. But there is a critical problem with such a claim: Dr. Fierro's report simply

does not establish Mr. Zornes's actual innocence of the offenses for which he was

convicted. Read at its broadest, the report establishes that the items recovered from

Mr. Zornes at the time of his arrest could not have caused some of the wounds found

on the victims. But those items were hardly the cornerstone in the State's case against

Mr. Zornes. As summarized by the Minnesota Supreme Court on direct appeal,

> Zornes was seen entering the apartment with Londo and
> Cadotte and no other individuals were seen with the
> victims or in the apartment around the time of the
> murders. There was extensive telephone and text message
> contact between E.M.'s cellphone and Cadotte's cellphone
> on the night of the murders, despite the fact that the two
> did not know each other. There is testimony that Zornes
> was using Cadotte's cellphone, thus placing him with the
> victims. A neighbor who lived in the apartment building
> heard "two males and a female" in the apartment beneath
> him. The apartment door was locked and Londo, who was
> last seen alive with Zornes, had the only key. Zornes made
> repeated, inconsistent statements to acquaintances that
> placed him in the vicinity of the apartment at the time of
> the murders and arson. Zornes stole Cadotte's car and set
> fire to it in a remote area. An investigation of the
> apartment revealed a location where it appeared a smoke
> detector had been removed and a smoke detector was
> subsequently found in Cadotte's car. It is highly likely that
> Zornes removed the smoke detector from the apartment
> and placed it in Cadotte's car. . . . The recovery of C.C.'s
> possessions from S.W.'s home, possessions that C.C. had
> stored in her apartment, also demonstrates Zornes was
> likely to have been at the scene of the murders and arson.

*Zornes I*, 831 N.W.2d at 623. Even after excluding entirely any inference regarding the

items seized at the time of Mr. Zornes's arrest, a great deal of evidence connected Mr.

Zornes to the crime scene. Exclusion of the seized items, or even an affirmative

finding that the seized items did not cause the deaths of Ms. Londo or Mr. Cadotte—

a finding that goes beyond the conclusion of Dr. Fierro's report—would still not be

sufficient to establish Mr. Zornes's innocence of the offenses for which he was

convicted.

Beyond actual innocence, at least two additional constitutional claims are arguably implied by Ground Thirteen. Although Mr. Zornes has not fairly presented those federal claims to the Minnesota Supreme Court, this Court will consider the merits of those claims in the interest of justice. *See* 28 U.S.C. § 2254(b)(2).

First, the claim raised in Ground Thirteen can be interpreted as sufficiency-of-the-evidence claim. The difference is subtle but important. "Unlike a review of the sufficiency of the evidence which focuses on whether a rational juror *could* have convicted, a habeas court considering actual innocence . . . determin[es] whether rational jurors *would* have convicted." *See Hayes v. Battaglia*, 403 F.3d 935, 940 (7th Cir. 2005) (Flaum, J., concurring). Moreover, it is well-established that insufficient evidence is a basis upon which to seek federal habeas corpus relief. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979) ("[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."). But any sufficiency-of-the-evidence claim presented by Mr. Zornes would ultimately fail for the same reason that his actual-innocence claim fails: a rational factfinder, hearing the evidence presented at trial, as summarized by the Minnesota Supreme Court above, could reasonably have concluded that Mr. Zornes was guilty of the offenses for which he was convicted. And this remains true even if the items seized upon arrest are ignored entirely.

Second, Ground Thirteen could be interpreted as encompassing an ineffective-assistance claim: had Mr. Zornes's trial counsel pursued the forensic evidence proffered by Dr. Fierro, then the items seized at the time of arrest would have been excluded from trial. This claim, however, would be largely duplicative of the claim raised in Ground Two of the habeas petition. The forensic report of Dr. Fierro did not differ substantially from the forensic analysis available to, but not used by, Mr. Zornes's attorney at trial—the items seized could not have caused some of the wounds found on the victims but could have caused others. As explained with respect to Ground Two, the incompatibility of the items with some but not all of the victims' wounds would not necessarily have required the exclusion of those items from evidence under Minnesota law. Any ineffective-assistance claim predicated on the failure to procure a report like that prepared by Dr. Fierro therefore would ultimately fail for the same reason that the ineffective-assistance claim raised in Ground Two failed.

For all these reasons, Ground Thirteen must also be denied.

## G. Conclusion

Many of the claims raised by Mr. Zornes in his federal habeas corpus petition have not been, and cannot now be, fairly presented to the Minnesota Supreme Court. Those claims have become procedurally defaulted and must be dismissed on that basis. The remaining claims fail on the merits. Accordingly, it is recommended that Mr. Zornes's habeas petition be denied.

Only one matter merits further comment:  A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his petition unless he is granted a certificate of appealability ("COA").  *See* 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  This Court is satisfied that the relevant standard of review precludes relief on Ground One of the habeas corpus petition, but Mr. Zornes has nevertheless made a substantial showing that his public-trial right has been violated.  Accordingly, this Court recommends that a COA be issued on the following question (the same question upon which counsel was appointed to represent Mr. Zornes before this Court):  The Minnesota Supreme Court concluded that Mr. Zornes's right to a public trial had not been violated during his criminal proceedings.  Was this conclusion contrary to or did it involve an unreasonable application of clearly established federal law, as claimed in Ground One of Mr. Zornes's habeas petition?  This Court recommends denial of a COA on all other claims.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED THAT:

58

1.    The petition for a writ of habeas corpus of petitioner Tracy Alan Zornes [ECF No. 1] be DENIED.

2.    That a certificate of appealability be issued on the following question: The Minnesota Supreme Court concluded that Mr. Zornes's right to a public trial had not been violated during his criminal proceedings. Was this conclusion contrary to or did it involve an unreasonable application of clearly established federal law, as claimed in Ground One of Mr. Zornes's habeas petition?

3.    That a certificate of appealability be denied on all other claims.

Date:  September 16, 2019                          *s/Katherine Menendez*
                                                  Katherine Menendez
                                                  United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).